## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| BRIAN HILL<br><br>Plaintiff,<br>vs.<br><br>SOUTH EASTERN SCHOOL DISTRICT, and ZANE S. FAKE, Individual<br><br>Defendants. | Case No.<br><br>Hon. |

## COMPLAINT AND DEMAND FOR JURY TRIAL

Brian Hill (hereinafter, "Plaintiff") moves the Court for entry of judgment in his favor against the named Defendants and in support of such Complaint avers as follows:

### PARTIES, JURISDICTION AND VENUE

1. This Honorable Court has jurisdiction pursuant to 28 U.S.C. §1331 as this case arises under and pursuant to federal law specifically, the Rehabilitation Act of 1973 Section 504 (hereinafter, "Rehab Act") and the Fourth Amendment to the United States Constitution. Moreover, this Honorable Court has jurisdiction over Plaintiff's state law claims to the extent that she pleads them pursuant to 28 U.S.C. §1367.

2. Venue lies within the Middle District of Pennsylvania pursuant to 28 U.S.C. §1391(b) (2) as the facts and occurrences, acts and/or omissions, and incidents and/or actions alleged herein took place within this judicial district.

3. Plaintiff brings this action against his current employer, Southeastern School District, (hereinafter "SESD"). SESD is a school district in York County, Pennsylvania located at 504 Main St., Fawn Grove, Pennsylvania 17321.

4. Defendant SESD is a recipient of federal financial assistance through, *inter alia*, funded reading programs, special education and nutrition programs sponsored by, *inter alia*, the American Recovery and Reinvestment Act of 2009, other Federal Stimulus funds, and federal resources from which the Pennsylvania Department of Education advises the School District to use the money for additional nonrecurring expenses like purchasing equipment, teaching resources like books, and software.

5. Defendant, Zane S. Fake (hereinafter "Fake") is an adult male and upon information and belief, resides within York County in the Commonwealth of Pennsylvania. Dr. Fake is employed by SESD as the school Principal.

6. Plaintiff is an adult male who, at all relevant times hereto, resides in the Commonwealth of Pennsylvania, York County, and is employed by SESD.

**UNDERLYING FACTS**

7. Plaintiff commenced employment with SESD on or about 2018.

8. Plaintiff's currently serves as a schoolteacher.

9. As background, on or about December 2021, Plaintiff and Lori Brinck "(Brinck") Plaintiff's co-teacher had a new student move in during the month of December from another school in the district. This student had behavioral issues and was disabled. This created a very challenging environment for the other classroom students and the teachers thereafter as the student was almost incorrigible at times due largely to their disability and the inability to control their behavior.

10. Plaintiff and Brinck did everything they could do to support the student and attempted to initiate help from the school principal, Fake, and the school counselor, Bobbi Gross ("Gross"). However, the assistance the Plaintiff and Brinck were receiving was not helpful and the students' behavior, while at times acceptable, was largely causing numerous disruptions in the classroom.

11. The Plaintiff and Brinck subsequently requested help to meet the student's needs and teach the student how to regulate their emotions for the safety of the other students in the class because this was a group of roughly 40 students that had their learning interrupted when there were disruptions by the student.

12. Furthermore, from December 2021 to the spring of 2022, the Plaintiff spent most of his teaching the students while Brinck served as a Personal Care Assistant ("PCA") while Plaintiff taught because the student needed a lot of assistance, and the school was not providing help.

13. Because Plaintiff and Brinck brought it to the attention of the administration that Gross was not supporting the emotional needs of the student, Plaintiff and Brinck were then targeted by Fake.

14. On April 6, 2022, Fake asked to meet with the Plaintiff and two of his colleagues, Sharon Janidlo ("Janidlo") and Brinck in a conference room at the school.

15. Fake met with the three of them and discussed their mental health claiming that he and other teachers had noticed they were angry and depressed.

16. Thereafter, Fake subsequently began a systemic effort to undermine the Plaintiff's evaluations and intimidate him causing him severe emotional distress.

17. For example, Fake would attend several of the meetings the Plaintiff and Brinck had with the student and could have been an intermediary, facilitating action to resolve the matters in the student's life and in the classroom but chose instead to remain uninvolved even while there was a crisis, and the Plaintiff and Brinck were advocating for the student.

18. While other district employees attempted to assist in helping with the student, and plans were created, the student seemed to fall through the proverbial cracks as Gross and Fake would not follow through on corrective actions which would have helped the Plaintiff and Brinck to maintain control of their classroom and do what they had been trained to do, teach and train their students including the student with behavior health issues.

19. Gross was thereafter asked to teach lessons to reinforce and support the new student. This was agreed upon by the instructional advisor, Kristin Johnson ("Johnson"). Gross agreed to teach two lessons but would only do it for the whole class, even though the primary concern was the new student with disabilities.

20. Thereafter, Gross ended up only teaching one lesson for the class that year and the student did not receive the appropriate assistance.

21. Thereafter, the retaliation persisted, when on or about August 17, 2022, Fake sent an email asking if anyone was interested in doing after school tutoring for social emotional needs.

22. On September 19, 2022, the third-grade teachers including Plaintiff, Hill, and Principal Fake had a grade level meeting. During this meeting, Fake told them that they were not allowed to do a behavioral Student Performance Measure (SPM) because they could not control the variables. This confused Plaintiff because the SPM is supposed to be decided by teachers.

23. At the end of this meeting, Fake asked them if they considered his email for after-school tutoring. Plaintiff and Brinck brought up the idea about having a social-emotional club and a gardening club. Fake asked him when he wanted to start these clubs since he was going on a sabbatical in November 2022. He told him that they would do it before Fake left for his sabbatical.

24. October 20, 2022, Plaintiff's sent his afterschool social-emotional club letter to Fake for approval.

25. On November 1, 2022, the after-school club began with roughly 25 students. 10 of which Plaintiff took care of and the other 15, Brinck took charge of.

26. On November 11, 2022, Plaintiff tried to submit a pay request for him and Brinck regarding the after-school club.

27. On November 16, 2022, Fake had a meeting with Plaintiff and Brinck, in which he told them that they cannot get paid this way. Instead, Fake told them that they had to pilot the club without pay *indefinitely* and then submit a request through the union to add the club to the district after school club list if they wanted a stipend for the club (emphasis added).

28. The Plaintiff and Brinck were very confused because Fake had previously told them that he had money set aside for social emotional tutoring and now he was saying that he did not want to use that money for this club.

29. During this meeting, Fake also told them that they had to figure out what to do with the students from 3:10 PM until 3:45 PM, which was set aside for teacher prep time. They asked Fake what the other buildings do for clubs, and he told them that the para-educators watch the students in the cafeteria until 3:45 PM.

30. This is the only after-school club that Fake told teachers to develop a plan for in which student supervision was to occur during the hours of during 3:10 PM until 3:45 PM., which consequently, was to occur during teacher prep time.

31. School policies state that building administrators are the ones supposed to develop a supervisory role for after school events, not teachers.

32. On or about January 24, 2023, Fake met with Plaintiff to talk about scheduling. Fake told Plaintiff that he was no longer allowed to have recess in the morning with his students. Plaintiff believed he was being targeted and harassed by Fake because of his opposition to retaliatory conduct due to his student advocacy and because of his opposition to the prior disclosures of his private medical information as well as the hostile environment Fake was creating since other classes were allowed to have morning recess and Fake even stands outside with the other teachers and students during the recess.

33. After Fake disallowed morning recess, there was a rise in bad behavior, ultimately resulting in a claim from the school counselor, Gross, that Plaintiff was harming the welfare of the children. The Plaintiff avers Fake was trying to undermine him and his colleague's positions at SESD because they were co-teachers and had asked him for the harassment to stop.

34. Thereafter, Fake began to act against the Plaintiff knowing it would have a negative effect on the third-grade classroom and Brinck because she and Hill were co-teachers.

35. To correct some teaching deficits due to the concerns in their classroom during the 2023 school year, the Plaintiff and Brinck closed their divider wall, and both taught two separate classes for third grade.

36. On February 2, 2023, Plaintiff had to send the student to the office at 1:20 PM for the overhand throwing of Lincoln logs in the face of another student. According to the school's student code of conduct, this infraction is a level IV violation since another child was physically assaulted.

37. When Plaintiff arrived at the office at 1:30 PM, the child was still sitting in the corner of the office. The Plaintiff then asked the secretary if Fake or Gross were in the building. The secretary told the Plaintiff that Fake left for the day and Gross was at lunch. The Plaintiff wanted to get the student back to class as soon as possible so he decided to talk to the student in the office rather than wait for the school counselor, Gross, to return. Therefore, the Plaintiff attempted to work with the student to gain his trust in the hope of resolving some of the classroom disruptions. During this time, the Plaintiff called on his colleague, Brinck, so that they could help the student. The secretary was present because of the location of her desk and office.

38. The Plaintiff talked to the student about making good choices with his life and they discussed several ongoing topics that he brought up in the classroom at different times throughout the school year. During this conversation, Brinck showed up and the Plaintiff asked for her assistance. Brinck made only one comment in support of the Plaintiff and the student, focusing the student on his mother's support. The secretary also commented when she was addressed.

39. On February 3, 2023, four teachers made comments about hallway behavior being an issue during the day, so Plaintiff and Brinck practiced walking in the hallway with their students to elicit appropriate behavior.

40. Thereafter, Gross approached the Plaintiff and Brinck to tell them that she would have to report the discussion they had with the homeless student on February 2, 2023, because she was worried that the student would commit suicide. It should be noted that although Gross stated this, no risk assessment was given to the student to support the claim as is customary.

41. Gross later told the Plaintiff and Brinck that when she called the home and asked to discuss how the student was doing given the conversation they had with the student the previous day, the mother asked if Gross was referring to the teacher that called her son a liar, a thief, and a cheat. Again, that is not what was said to the student in the office.

42. On February 8, 2023, Gross gave Fake a report regarding the February 2, 2023, meeting with the student, although she was not present, so the report was all based on assumptions and presumably hearsay from other parties.

43. On or about February 9, 2023, Fake sent Loralie Harpster ("Harpster") down to Plaintiff's classroom to escort Plaintiff to the office for a "fact-finding" meeting. Plaintiff was not given any prior notice of this meeting and Plaintiff did not want Harpster in the meeting to take notes for privacy reasons and because he was concerned, she was helping Fake undermine Plaintiff. Therefore, the Plaintiff requested postponing the meeting and asked to bring his own note taker. Plaintiff told them that it was nothing personal but that he did not want Harpster in the room for Plaintiff's meeting.

44. Thereafter, Fake left the room and made a phone call. When he came back into the room, he told Plaintiff that he could not talk to anyone, but he would reschedule the meeting for the following day. The Plaintiff asked Fake who he was not allowed to talk to and what he was not allowed to talk about, but Fake never gave him any clarity. He simply said not to talk to anyone.

45. On February 10, 2023, the Plaintiff asked Kim Smith ("Smith") another teacher to take notes for his meeting. She said she did not want to get involved, it is believed, because she was one of the teachers who Fake discussed the Plaintiff's and Brinck's mental health issues with and Plaintiff avers, she was told about the

meeting agenda beforehand. Harpster was in the meeting despite Hill's objections. Fake reprimanded the Plaintiff in the meeting for his conduct with the student on February 2, 2023, although the Plaintiff was trying to assist the student and no one else was available to do so. Additionally, nothing that Plaintiff or Brinck was quoted as saying showed any type of harassment or discrimination towards the student and the reprimand caused Plaintiff's professional reputation to be questioned and ruined.

46. On February 10, 2023, Plaintiff went to his "fact-finding" meeting with Fake, Tracey Kerr ("Kerr") Human Resources, ("HR") Caryn Jones ("Jones") (Plaintiff's note taker), and Harpster. Plaintiff asked why Harpster was present because Plaintiff had specifically asked for her not to be there and Fake said that he wanted her there as his note taker. This concerned the Plaintiff because HR was attending the meeting and taking notes. The one person that Plaintiff specifically requested not to be in the meeting was asked to come in on her personal day off to take notes for Fake. This made Plaintiff very uncomfortable, as he was once again having his personal information shared with a colleague.

47. Accordingly, the Plaintiff felt that Fake was intimidating him and again circumventing policy to allow a colleague to have information about his health and personal information.

48. On or about February 22, 2023, Fake asked Plaintiff to attend a disciplinary meeting. The Plaintiff was in his classroom, but no coverage was provided for him to attend the meeting with Fake as was the policy. At the end of the day, Fake texted Plaintiff wondering where he was. Plaintiff told Fake that he did not get coverage but that he would head down to Fake's office anyway. Consequently, Fake held the meeting during Plaintiff's end of the day prep time. One thing that confused the Plaintiff is that the student was being removed from his class weeks after it was claimed the child's welfare was endangered. If Fake felt that Plaintiff was endangering the welfare of a student, why would he leave the student in the Plaintiff's classroom for almost a month after the incident.

49. On February 25, 2023, Plaintiff was forced to tell his students that they were no longer allowed to meet with Brinck's class for class rewards which is a consequence that Fake gave them in a letter he gave to Plaintiff. This consequence affects the students' reward system. Two different students asked, "Why does Dr. Fake hate us so much?"

50. During Plaintiff and Brinck's reprimand, they were also told that 30 minutes of walking with students was excessive and they would be disciplined for making the students learn to walk appropriately in the hallways, this, although school policy requires that students have reinforced and corrective measures and further, that the American Heart Association requires 40 minutes of walking for students

each day and the Plaintiff and Hill added the student activity to their student wellness plan, which was customary.

51. To further demonstrate the hostile work environment being created by Fake, on March 20, 2023, Carol Awalt ("Awalt") had a meeting with Fake in the morning and he questioned her about taking a table out of the faculty room that was given to her by Janidlo. Awalt later told Plaintiff and Brinck that as she was walking out of his office, Fake threw something at the wall near her. Awalt was stunned and crying and told Plaintiff and Brinck that she wanted it to be over, but that Fake called her back up to the office later that day to continue to reprimand her with the office door open and the secretaries sitting at their desks listening to him. Awalt begged Fake to close the door during the meeting, but he refused.

52. Further, on March 31, 2023, Brinck texted the Plaintiff telling him that a parent sent her a private message asking her if she should reach out to Fake because she is getting frustrated as a parent that he is taking motivators away from their classes. This parent has a 3rd grader in another class at the school and she was noticing the discrimination happening to the classrooms. Plaintiff and Brinck then called the mother and told her that she could email Fake as it was her right.

53. Once more, on April 14, 2023, Fake sent an email ending F.I.R.E. time for the students, which is an intervention block including learning support. This ended learning support services a month early and the student's IEP was not then

followed the last month of school by the learning support teacher so that she could do district DIBELS assessments.

54. On May 4, 2023, Fake requested a meeting with Plaintiff to tell him that he was moving Plaintiff to fourth grade. During this meeting, Fake told Plaintiff that Plaintiff has been very successful with this group of third graders and that he would like Plaintiff to "loop" with them. This is not a voluntary move, and it would place the Plaintiff in a grade level with the teacher who attended Plaintiff's fact-finding meeting, which meeting violated Plaintiff's privacy. It also moves the Plaintiff with the students that Fake accused him of discriminating against and harassing. Fake told Plaintiff that Plaintiff was having success with these students but wrote him up for how he allegedly treated them poorly. This confused Plaintiff because Fake's words did not match his actions. The Plaintiff believed the changes were intended to allow him to use Harpster to help him surveil the Plaintiff in violation of the Collective Bargaining Agreement ("CBA") and his right to privacy.

55. On May 8, 2023, one of the parents reached out to Plaintiff expressing her concerns with the lack of support that her child is receiving. The parent was upset because her child told her that he is no longer being provided Learning Support services and she didn't understand why since her son has an IEP.

56. On May 12, 2023, Plaintiff discovered that a colleague who also teaches third grade was transferring to another building in the district. This now meant that Plaintiff's move to fourth grade was not necessary. Plaintiff sent an email to Kerr (HR), and Fake requesting to remain in third grade for the upcoming school year.

57. On May 15, 2023, Fake sent an email in response that stated he was going to go forward with his decision to move Plaintiff to fourth grade.

58. On May 15, 2023, Plaintiff emailed Fake to ask him about PVASS reporting. Fake had classroom teachers marked as "100% ownership" for learning support students. Fake responded with an email telling Plaintiff that learning support teachers do not take ownership. Several other teachers in other buildings of the school district have indicated to Plaintiff that their learning support teachers do take ownership. This, again, left Plaintiff skeptical that disabled and homeless students were receiving adequate support.

59. On May 18, 2023, Plaintiff noticed a picture of Fake with a security camera in the lobby. This intimidated the Plaintiff as Plaintiff believes he took this picture to send the message that he would surveil the Plaintiff and Brinck. In the picture it had Fake – in the lobby with a security camera with the words, "I've got my EYES on you" which Plaintiff also took as a direct threat, considering the surrounding circumstances and overall high-conflict nature of the workplace.

60. On May 31, 2023, Plaintiff met with Fake to go over Plaintiff's end of the year evaluation. During this meeting, Fake told Plaintiff that Plaintiff should have earned a 2 in Domain 4 but because of the incident in February 2023, Fake was going to give Plaintiff a 1. Fake gave Plaintiff no other evidence besides this one event, and this is the first time that Plaintiff has not received a satisfactory score on the evaluation since Plaintiff has been working in the district. The domain that Fake gave Plaintiff a 1 in is a subjective domain. Fake did not provide any evidence to support this score. Plaintiff avers that Fake took this action to undermine his position and force him from his job.

61. Plaintiff filed a grievance against Fake for violating the CBA and Fake later denied the grievance.

62. On June 6, 2023, Plaintiff met with his doctor to discuss reoccurring symptoms related to the treatment Plaintiff had been receiving from Fake. Plaintiff was placed on anxiety medicine and his medical conditions were documented.

63. On June 13, 2023, Plaintiff requested and attended a meeting with the school superintendent, Dr. Van Deusen ("Van Deusen") to discuss the grievance and building concerns. During this meeting, Plaintiff brought up that there was no evidence given to him by Fake to support giving Plaintiff a letter of reprimand. Plaintiff also told Van Deusen that Fake is a proven liar, and that the information should not be counted as fact. Van Deusen asked how Plaintiff knew Fake was a

liar and Plaintiff told Van Deusen that Fake lied to Plaintiff when Fake said that Plaintiff requested Harpster attend his meeting. Van Deusen agreed with Plaintiff by saying that should never have happened.

64. Plaintiff also reminded Van Deusen that Fake had lied to Brinck during her evaluation when he said that the administration wanted to put her on an improvement plan. Van Deusen didn't respond to that but when Brinck questioned Van Deusen, he told her that it was not true.

65. During this time, Plaintiff expressed his concern about being evaluated by someone who has lied. Plaintiff talked to Van Deusen about the grievance and explained how the CBA was violated. Van Deusen told Plaintiff that he had to go to fourth grade because it was always going to be Plaintiff or Brinck. During this meeting, Plaintiff also told Van Deusen that Fake appeared to be setting Plaintiff up to fail and offered no support during the school year after the incident in February 2023. Additionally, during this meeting, Plaintiff asked Van Deusen if the student that they were concerned about had been given a risk assessment or was MTSS'd (which means Multi-tiered System of Supports). Van Deusen wrote it down in his notebook. Van Deusen then told Plaintiff that "…we needed to sit down and figure out how we are going to move forward since this sounds like a house divided."

66. Plaintiff asked Van Deusen how sitting down was going to solve his new diagnosis of anxiety and bed wetting condition due to Fake's treatment of him, which is well documented by his doctor. Plaintiff then handed Van Deusen his rebuttal and interview notes at the conclusion of the meeting and Van Deusen said that he would place those items in Plaintiff's personnel file.

67. On June 14, 2021, an anonymous survey was sent to the Positive Behavioral Interventions and Supports "PBIS" committee mentioning Plaintiff's name and an improvement plan. Now, Plaintiff cannot even attend training without being attacked by other colleagues. Plaintiff feels like his privacy has again been invaded due to the survey about him being distributed to his colleagues.

68. The Plaintiff continues to experience a hostile work environment at SESD to this present day.

69. The SESD is liable under a continuing violation theory.

70. Further, the SESD is responsible/liable for the actions of its agents under a theory of *Respondeat Superior*.

**COUNT 1**
**REHABILITATION ACT**
**HOSTILE WORK ENVIRONMENT**
**Plaintiff v SESD (Only)**

71. Plaintiff incorporates herein the previous averments as if fully set forth.

72. The Plaintiff avers that he is a qualified individual with a disability under the Rehab Act due to his anxiety, depression and bedwetting and SESD's notice of

the same. Additionally, the Plaintiff has been under a physician's care for his disabilities since he was diagnosed.

73. The Plaintiff was subjected to unwelcome harassment after he gave SESD notice of his anxiety and after his reports of SESD's bullying and harassment.

74. Further, Plaintiff has been harassed since he advocated for a disabled and a homeless student who needed interventions due to homelessness, or poor behavior and disability issues.

75. Further, Plaintiff was subjected to humiliation and harassment when school officials fail to correct or remedy the ongoing harassment by SESD officials and his reports of Fake's invasions of his privacy and unauthorized disclosures of his private life especially as it regarded his private medical conditions.

76. Further, after he had made a statement in good faith regarding SESD's harassment, he was intimidated by school officials including but not limited to, Fake and other colleagues.

77. Further, Plaintiff was subjected to a hostile work environment because he has been repeatedly mistreated when agents of the Defendant intentionally, negatively, and callously communicate within the school about the Plaintiff's health issues, private life and alleged negative performance.

78. The harassment is based on Plaintiff's mental disability because the negative statements include statements about his health conditions and the fact that he became upset about the harsh treatment.

79. Further, the harassment has been and is sufficiently severe or pervasive as to alter the conditions of Plaintiff's employment, and to create an abusive and hostile working environment as it has resulted in multiple privacy disclosures and negative performance evaluation.

80. SESD knew, or reasonably should have known of the harassment, and failed to take prompt, effective remedial action, instead taking adverse action against the Plaintiff, further disciplining and berating him due to his conditions.

81. The fact that the Plaintiff's supervisors were perpetrators of the harassment and discrimination entitles the Plaintiff to strict liability against SESD for his claims.

**WHEREFORE**, Plaintiff prays that this Honorable Court will order all appropriate relief pursuant to the Rehabilitation Act of 1973 Section 504 and all applicable statutory remedies including but not limited to: withdrawal of federal grants, monetary relief for the plaintiff, including as applicable economic and compensatory damages and all reasonable attorney's fees and costs.

## COUNT 2
## REHABILITATION ACT RETALIATION
### Plaintiff v SESD (Only)

82. Plaintiff incorporates herein the previous averments as if fully set forth.

83. The Rehabilitation Act prohibits retaliation in the workplace against teachers who have, *inter alia*, engaged in protective activity, or to have otherwise opposed practices made unlawful under the law, suffered an adverse action, and there is a causal connection between the two.

84. The Plaintiff's notification of a disabled and homeless students' needs constitutes "protected activity" pursuant to state and federal law.

85. Further, Plaintiff repeatedly opposed SESD's practice of harassment and bullying based upon his notifications of the needs of the disabled and homeless students.

86. SESD retaliated against the Plaintiff on account of his protected activity by reprimanding him without cause, stalking him and causing him to be intimidated and fearful for his safety, lower his domain credits for his status as a teacher, threatening termination, and performance improvement plans, and lying about school administrators plans to discipline him and his colleagues.

87. The Plaintiff therefore avers that SESD's purported basis to discipline him (e.g., that he was not effectively performing his job or violating school policies) is false and erroneous as the real reason for his discipline is due to his disabilities: anxiety and depression and because of his advocacy for a disabled and a homeless student.

88. As a result of all the above, the Plaintiff avers that SESD retaliated against her on account of her protected activity by imposing disciplinary measures as well as subsequent intimidation for her reports about the student.

**WHEREFORE**, Plaintiff prays that this Honorable Court will order all appropriate relief pursuant to the Rehabilitation Act of 1973 Section 504 and any other applicable statutory remedies including but not limited to: withdrawal of federal grants, monetary relief for the plaintiff, including as applicable compensatory damages and all reasonable attorney's fees and costs.

### COUNT 3
### FOURTH AMENDMENT ILLEGAL SEARCH AND SEIZURE
### 42 U.S.C. § 1983
### Plaintiff v. All Defendants

89. Plaintiff incorporates herein the previous averments as if fully set forth.

90. The Fourth Amendment states: "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated ...." Further, "[t]he Amendment guarantees the privacy, dignity, and security of persons against certain arbitrary and invasive acts by officers of the Government [.]" *Skinner v. Railway Labor Executives' Assn.*, 489 U.S. 602, 613–614, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989).

91. Defendants, as more fully named above, and based upon its illegal policies or customs, or lack thereof, individually and collectively, acted and/or validated the action(s) of, and intentionally intruded upon the Plaintiff's privacy in that they searched and seized his medical information, disclosed information they had become privy too, to third parties, and discussed private information at work without his consent, permission or justification.

92. The Plaintiff had a subjectively and objectively reasonable and legitimate expectation of privacy in his personal and medical information, which was shared and discussed with colleagues, as more fully noted herein.

93. A reasonable person would find the intentional, malicious, and willful intrusion into the Plaintiff's privacy to be highly offensive and/or morally reprehensible to any reasonable person.

94. The Defendants had no justification for distributing the Plaintiff's personal and/or medical records and/or information without his consent.

95. In this regard the Defendants were intentionally or deliberately indifferent to the Plaintiff's privacy rights.

96. Further, Plaintiff did not and could not have consented to such a search and seizure on the part of the Defendants since he was not made aware of his right to choose not to capitulate to the disclosures as he had no control over the disclosures, therefore any disclosures were involuntary.

97. Additionally, Plaintiff was forced to endure embarrassment and was placed under threat, explicit or implied, of termination and/or physical harm.

98. Wherefore, Plaintiff has suffered damages and demands judgment in his favor to the fullest extent of the law.

## PRAYER FOR RELIEF

**WHEREFORE**, the Plaintiff prays that the Court grant relief on her Causes of Action as specified below.

99. Plaintiff prays that the Court issue injunctive relief enjoining SESD, its officers, agents, employees, and all others acting for, or succeeding SESD, from engaging in the discriminatory employment practices alleged in this complaint that discriminate against the Plaintiff in violation of the Rehab Act because of his disability.

100.  Plaintiff prays that the Court issue injunctive relief enjoining SESD, its officers, agents, employees, and all others acting for, or succeeding SESD, from engaging in the retaliatory employment practices alleged in this complaint that retaliate against the Plaintiff in violation of the Rehab Act because of his reports of a disabled and homeless students' needs under the law.

101.  The Plaintiff prays that the Court issue an injunction ordering and requiring that SESD formulate, institute, adopt and maintain policies and practices which will provide equal employment opportunities to the Plaintiff and other currently disabled employees or future disabled employees and applicants for employment, and which will to the extent practicable remedy the continuing effects of past discrimination against the Plaintiff and other disabled Americans and restore

them to the employment status and position they would have held and enjoyed but for the unlawful discrimination complained of herein.

102.   The Plaintiff prays that the Court issue an injunction ordering and requiring that SESD formulate, institute, adopt and maintain policies and practices which will provide appropriate services for disabled and homeless students, and which will to the extent practicable remedy continuing effects of past retaliation against teachers for seeking appropriate standards of assistance for these students.

103.   The Plaintiff prays that the Court award monetary relief as follows:

104.   On his Causes of Action, order Defendant to pay equitable monetary relief and compensatory damages to the Plaintiff as are asserted under the Rehab Act as applicable, and in an amount to be proven at trial.

105.   The Plaintiff prays that the Court award his costs, expenses, and attorneys' fees, payable by SESD as follows:

106.   By determining that the Plaintiff is a prevailing party on his Causes of Action and thereupon awarding Plaintiff his reasonable costs, expenses, and attorneys' fees incurred in bringing this action under applicable statutory language.

107.   The Plaintiff prays that the Court award further monetary relief as follows:

108.   The Plaintiff prays that the Court order SESD to pay pre- and post-judgment interest in all monetary amounts awarded in this action, as provided by law.

109.   The Plaintiff prays that the Court retain jurisdiction of this case for a sufficient period to assure that SESD has fully complied with the injunctions requested herein and has remedied to the greatest extent practicable the discriminatory policies and practices complained of herein, and that SESD is operating in full compliance with the requirements of the Rehab Act regarding its employment policies and practices.

110.   The Plaintiff prays that the Court awards all appropriate pain, suffering, humiliation, and punitive damages as and where applicable under his causes of action regarding the individual defendants.

111.   The Plaintiff prays that the Court awards all appropriate monetary, injunctive, and equitable relief under her cause of action under the Fourth Amendments.

112.   The Plaintiff prays that the Court award all appropriate pain, suffering and humiliation damages under her causes of action as applicable regarding SESD.

113.   The Plaintiff prays that the Court award such other and further relief as this Court deems equitable and just.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff hereby respectfully demands trial by jury on all counts so triable.

DATED this the 12th day of September 2023.

*By: /s/ Jeremy A. Donham, Esquire*
Jeremy Donham, (206980)
**DONHAM LAW**

714 Venture Drive, Ste. 144
Morgantown, West Virginia 26508
717.881.7855 (Phone)
Email: J.Donham@Donhamlaw.com

Jesse C. Markley (315758)
**Markley Law Firm, LLC**
1350 Woodridge Dr.
Middletown, PA 17057
717.376.8403 (Phone)
Email: MarkleyLawFirm@gmail.com

***Co-Counsel for Plaintiff***